IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ARETE WEALTH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 24 C 2191 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| JACK R. THACKER, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

*"If freedom of contract means anything, it means that parties may make even foolish bargains and should be held to the terms of their agreements."*
11 Williston on Contracts, § 31.5 (4th ed. 2019).

**INTRODUCTION**

The Defendant, Jack Thacker, is the former owner of Center Street Securities and the holding company that owned it, Center Street Holdings. He sold the Center Street package to Old Growth Capital pursuant to a Stock Purchase Agreement ("SPA") in December 2020. The complex 75 page agreement was executed by Mr. Thacker and by the Chief Executive Officer of Old Growth Capital LLC. According to Old Growth's successor in interest, Arete Wealth – the Plaintiff here – that package turned out to be, colloquially speaking, a "mess." Customer arbitrations involving claimed misconduct by Center Street employees and other issues came to fruition following the closing, with customers seeking millions of dollars in damages. Perhaps not surprisingly, the Plaintiff filed suit against Mr. Thacker a little over three years later, claiming fraud in the inducement, breach of contract, and seeking indemnification. [Dkt. #1]. In response, the Defendant moved to dismiss the Complaint, [Dkt. #10], and the Plaintiff responded with an Amended Complaint [Dkt. #17], which the Defendant has also moved to dismiss. [Dkt. #28]. The parties have consented to jurisdiction here.

**DISCUSSION**

**A.**

The sophisticated players in this unfortunate drama had the obvious motivation and means to have retained multiple, highly skilled lawyers to put together an Agreement governing the transaction that lies at the heart of this case. As all too often happens, things did not work out as hoped for, and the contracting parties are now disputing the meaning of their Agreement. Unfortunately, it appears that significant, pertinent language in the parties' Stock Purchase Agreement has apparently not been addressed in the briefs.

As noted, the Amended Complaint charges that at the time of the sale while CS Securities was under Mr. Thacker's control Mr. Thacker concealed CS Securities' noncompliance with its own internal policies, the Rules of FINRA, and federal securities laws. [Dkt. #17, Pars. 2, 9]. It calls these claimed non-compliance issues "ticking time-bombs," which, it is contended, constituted "Liabilities" under the SPA. [*Id.* at ¶ 18-19]. *See Tarrant Regional Water District v. Herrman*, 569 U.S. 614, 615 (2013); *Coatney v. Ancestry.com DNA, LLC,* 93 F.4th 1014, 1020 (7th Cir. 2024).

We begin, as we must, with the terms of the contract. Section 3.06(a) of the SPA provided that CS Holdings and its wholly owned subsidiaries:

> have no Liabilities except (a) those which are adequately reflected or reserved against in the Balance Sheet as of the Balance Sheet Date, and (b) those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date and which are not, individually or in the aggregate, material in amount.

SPA, page 21.

The SPA broadly defines "Liabilities" as:

> any liability, commitment or obligation (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or

2

unaccrued, whether liquidated or unliquidated, and whether due or to become due).

SPA, page 8. This representation, which is claimed by the Plaintiff to have been knowingly false, is the cornerstone of the Amended Complaint. [Dkt. #17, Pars. 17- 19, 22, 41-67, 69, 72, 77, 82].

According to the Amended Complaint, "CS Securities' serial improper business practices were *Liabilities* of CS Holdings, *as that term is defined in the SPA*, that were not reflected in the Balance Sheet, incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date, or otherwise disclosed by [Defendant] in connection with the SPA." [Dkt. #17, ¶. 22](Emphasis supplied)**.** But, Mr. Thacker contends, under the terms of the SPA, these allegedly "improper business practices" fall *not* into the category of "Liabilities" as the plaintiffs contend they do, but rather fall under the category of "Legacy Arbitrations." [Dkt. #28, at 1]. The SPA defines "Legacy Arbitrations" as:

> all FINRA or other arbitrations, or any ancillary Actions relating thereto (including all related counterclaims, cross claims, appeals and other similar Actions), whether threatened, pending or pursued at some future date (including after Closing), brought by any Person in connection with, in whole or in part, such Person's purchase or ownership of any investment products sold by Securities prior to the Closing Date, including those described in Section 3.13(a) of the Disclosure Schedules.

SPA, page 8.

Under the terms of the SPA, the Defendant also represented that:

> (a) Section 3.13(a) of the Disclosure Schedules accurately and completely describes all Legacy Arbitrations involving the Companies pending before FINRA as of the Closing Date.
>
> (b) *Other than the Legacy Arbitrations, there are no Actions pending or, to Seller's Knowledge, threatened against or by the Seller, or any of the Companies: (I) relating to or affecting any of the Companies* or any of the Companies' properties or assets; or (ii) that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

3

SPA, page 27, Section 3.13 (Emphasis supplied).

Plaintiff argues that because the term, "Liabilities," is broadly defined in the Stock Purchase Agreement to include "any liability, commitment or obligation," even those "unknown," "unasserted," or "unaccrued," the parties clearly intended that the term, "liabilities" included anything that *could* give rise to a legal obligation or to any accountability. It is further contended by the plaintiff that by comparison, the term "Legacy Arbitrations" is "narrowly defined" and limited to "all FINRA or other arbitrations, or ancillary Actions relating thereto (including all related counterclaims, cross claims, appeals and other similar Actions)." [Plaintiff's Opposition to Motion to Dismiss, Dkt. #33 at 7]. Finally, Plaintiff contends that even though the Defendant's alleged, underlying, improper business practices had not at the time of the Agreement resulted in the assertion of legal claims or proceedings, they are nonetheless "Liabilities" as explicitly defined in the Agreement. [Plaintiff's Opposition to Motion to Dismiss, Dkt. #33, at 7].

In assessing the soundness of a contention based on a contractual position, it is appropriate – indeed essential – to examine the accuracy with which that term is quoted. Misquotation of a significant contract term is impermissible and cannot be a basis for any contractual interpretation resting on the misquotation. Here – inexplicably and unfortunately – in purportedly quoting the relevant portion of the Stock Purchase Agreement – the Plaintiff's brief in opposition to the Defendant's Motion to Dismiss has substituted a period for the comma that precedes the actual contractual definition of "Legacy Arbitrations" and has omitted contractual language that seemingly conflicts with its claim that the term, "Legacy Arbitrations," is defined "narrowly." [Dkt. #33 at 7]. In fact, the opposite is true. The term, "Legacy Arbitrations," is *not* narrowly defined. Quite the contrary. The term "Legacy Arbitrations," as defined in the parties' Agreement, includes all those:

. . . , whether threatened, pending or pursued at some future date (including after

4

>Closing), brought by any Person in connection with, in whole or in part, such Person's purchase or ownership of any investment products sold by Securities prior to the Closing Date, including those described in Section 3.13(a) of the Disclosure Schedules.

SPA, page 8.

To reiterate, the actual definition of Legacy Arbitrations in the Stock Purchase Agreement is as follows:

>all FINRA or other arbitrations, or any ancillary Actions relating thereto (including all related counterclaims, cross claims, appeals and other similar Actions)**, whether threatened, pending or pursued at some future date (including after Closing), brought by any Person in connection with, in whole or in part, such Person's purchase or ownership of any investment products sold by Securities prior to the Closing Date, including those described in Section 3.13(a) of the Disclosure Schedules.**

(Emphasis supplied).

But, at the risk of repetition, in quoting the terms of the "Legacy Arbitrations" provision in their brief, the plaintiffs have omitted all the terms that appear above in bold face. Thus, the plaintiffs' brief improperly misquotes the definition of "Legacy Arbitrations" as:

>"all FINRA or other arbitrations, or ancillary Actions relating thereto (including all related counterclaims, cross claims, appeals and other similar Actions)."

Any question that the breadth of this contractual provision might have resulted from some inadvertent error is refuted by the obviousness and importance of the provision, itself, and by the skill and experience of the lawyers who drafted the Agreement that was to govern the very transaction that they were hired to oversee and implement. And, if that were not enough, the language chosen by counsel was repeated thereafter, thus negating any notion that there may have been some error in drafting the Agreement. [Dkt. #33, at 7, 15]. Moreover, what was done in the Contract was done not once, but twice. [Plaintiff's Opposition to Motion to Dismiss. Dkt. #33, at 7, 15]. As the Plaintiff has stressed, language that seems to undermine the claim that the term, "Legacy Arbitrations," is

5

"narrowly" defined is omitted in the Plaintiff's argument in opposition to the Motion to Dismiss. But, without the misquote, the Plaintiff's contractual argument regarding the *broad* definition of "Liabilities" versus the *narrow* definition of "Legacy Arbitrations" is open to serious question.

But this does not necessarily mean the alleged "underlying improper business practices" charged in the Complaint cannot fit into the category of "Liabilities." The Defendant's position, though not based on a misquotation of a contract provision, is based on what appears to be at least a significant misreading of the SPA. The defendant's brief in support of the Motion to Dismiss repeatedly denies the Plaintiff's contention that a claim for fraud or breach could be based on liabilities that were unknown at the time the parties entered into the contract.[1] He has expressed surprise that the Plaintiff could think that the term "liabilities" as used in the Agreement included liabilities that were unknown at the time of the SPA. The answer is found in the Contract's definition of "Liabilities" – a definition that the Defendant's lawyers either proposed or agreed to – and thus should not have come as a surprise to Mr. Thacker. In any event, the agreed-to term specifically includes "unknown" liabilities, "unasserted" liabilities, "contingent" liabilities, and so on. And such a term would not be unusual in a contract like that involved in this case. Having agreed to so broad-based a definition, Mr. Thacker cannot now ignore or avoid its obvious consequences. *See, e.g. John Hancock Life Insurance Company v. Abbott Labs*, 478 F.3d 1, 7-8 (1st Cir. 2006); *Vam Checkcashing Corp. v.. Federal*

---

[1] *See, e.g.,* [Dkt. #28, at 1 ("Arete's allegations are predicated on the erroneous premise that Thacker can be held liable for concealing obligations that did not yet exist and were thus *unknown*.")(emphasis added); Dkt. #28, at 8-9 ("Arete's claim is predicated on the assertion that [Mr.] Thacker knew Center Street was subject to *unknown, unasserted* Liabilities—i.e., future arbitration demands.")(emphasis added); Dkt. #28, at 10 ("Arete's claim is predicated on the assertion that Thacker knew Center Street was subject to *unknown, unasserted* Liabilities—i.e., future arbitration demands.")(emphasis added); Dkt. # 28, at 11 ("Because any definition of "liability" encapsulates an existing or expected duty to pay, the SPA's definition cannot include the mere risk of some potential *future* suit.")(emphasis added); [Dkt. #28, at 16 ("As discussed, while the SPA may have expanded that traditional definition of a liability, it does not encompass *future, unknown contingent* claims of indeterminate value that may or may not ever be asserted and which may or may not have legitimacy.")(Emphasis added)].

*Insurance Co.,* 649 F.3d 727, n.2 (2d Cir. 2012); 3 Corbin On Contracts, § 544 (1960). "If freedom of contract means anything, it means that parties may make even foolish bargains and should be held to the terms of their agreements." 11 Richard A. Lord, Williston on Contracts, § 31.5 (4th ed. 1999). Neither courts nor contracting parties may rewrite the parties' agreed-upon contract to impose obligations to which the parties did not agree or to exclude provisions on which they did. *See Axis Ins. Co. v. American Specialty Ins. & Risk Svcs.*, 111 F.4th 825, 834 (7th Cir. 2024); *Hartford Accident & Indemnity Co. v. Lin*, 97 F.4th 500, 510 (7th Cir. 2024); *Facebook, Inc. v. Rankwave Co.*, 2019 WL 8895237, at *4 (N.D. Cal. 2019); *United Airlines, Inc. v. ALG, Inc.*, 916 F.Supp. 793 (N.D.Ill. 1996).

**B.**

The Defendant's reliance on a supposed, traditional dictionary definition of "Liabilities" ignores the fact that the SPA has its own, mutually chosen and agreed-on definition of Liabilities, which includes those that are *unknown*. As the Defendant concedes, this definition expanded the traditional notion of "liabilities."[2] Through thirty-two pages of briefing, Mr. Thacker never grapples with the fact that the mutually agreed-to definitions in the SPA, as opposed to Black's Law Dictionary or GAAP or some other abstract definition, are controlling here. Thus, "Liabilities" include those that are *unknown.* This mutually agreed on definition, chosen by the parties and their sophisticated counsel, cannot now be ignored.

**C.**

The compliance issues the Amended Complaint alleges and which apparently have come home to roost, would have made them at the time of the Agreement's execution, "unknown,"

---

[2] The defendant states in his brief: "As discussed, while the SPA may have expanded that traditional definition of a liability, it does not encompass future, unknown contingent claims of indeterminate value that may or may not ever be asserted and which may or may not have legitimacy." [Dkt. #28, at 16].

7

"unasserted," and/or "contingent" liabilities under the Agreement. I realize that the definition of "Liabilities" in the SPA appears to be nothing more than a stock, form definition that is common in many such Agreements – although, based on Mr. Thacker's brief in support of his Motion to Dismiss, it seems as though (in hindsight) it may not have been appropriate to have agreed to the use of that term in the SPA. But that does not mean that the term cannot now be ignored. "A contracting party cannot disavow his agreements merely because in retrospect that party may have made an imprudent bargain. Hindsight is, unfortunately, often more discerning than foresight. "[W]e cannot see with foresight what we so clearly see with hindsight...." *Hassan v. City of New York,* 804 F.3d 277, 309 (3rd Cir. 2015). If customer claims arising in the future from previous alleged improper past business practices of a seller – but unknown to a buyer – cannot be considered "unknown, unasserted liabilities" – the phrase used in the Stock Purchase Agreement – it is difficult to think of an example of what could.

While there are other points made in the parties' briefs, given the foregoing discussion, the best course would seem to be to deny the Defendant's motion to dismiss and allow both sides an opportunity to reexamine their positions in light of the language they chose in the Purchase Agreement. Courts are reluctant to make a ruling based on briefs that either ignore or misapprehend key provisions in a contract. *See* Brandeis, *The Living Law*, 10 Ill.L.Rev. 461, 470 (1916); Holmes, The Law, in Collected Speeches 16 (1931). Thus, after some further examination the parties may wish to reassess their positions. The court, of course, is available to consider any further motion that comes to grips with the mutually agreed upon, contractual language that unfortunately has not been acknowledged in the present filings.

For the preceding reasons, the Defendant's motion to dismiss the Amended Complaint [Dkt. #28] is denied without prejudice to refiling should the parties decide to reexamine the positions they have taken with regard to the language of the Stock Purchase Agreement.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 2/11/25